**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FREEDOM WATCH, INC.**<br><br>         **Plaintiff,**<br>**v.**<br><br>**NATIONAL SECURITY AGENCY, ET. AL.,**<br><br>         **Defendants.** | Civil Action No. 1:12-cv-01088-CRC |

## NOTICE OF APPEAL

NOTICE is hereby given that Plaintiff Freedom Watch appeals to the United States Court of Appeals for the District of Columbia Circuit from the Order and Memorandum Opinion of this Court entered on June 12, 2014 (Docket Nos. 24,25)(Exhibit 1,2), which granted summary judgment to the Defendants, and all other orders and rulings adverse to Plaintiff in this case.

Dated: July 14, 2014

Respectfully Submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
FREEDOM WATCH, INC.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW #345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 14th day of July, 2014 a true and correct copy of the foregoing Notice of Appeal (Case No. 1:12-cv-1088) was submitted electronically to the U.S. District Court for the District of Columbia and served via CM/ECF upon the following:

John K. Theis
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, NW
Room 6107
Washington, DC 20530
John.K.Theis@usdoj.gov

*Attorney for Defendants.*

                             Respectfully Submitted,

                             /s/ *Larry Klayman*
                             Larry Klayman, Esq.
                             FREEDOM WATCH, INC.
                             D.C. Bar No. 334581
                             2020 Pennsylvania Ave. NW #345
                             Washington, DC 20006
                             Tel: (310) 595-0800
                             Email: leklayman@gmail.com

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREEDOM WATCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, and DEPARTMENT OF STATE, <br><br> Defendants. | Case No. 1:12-cv-01088 (CRC) |

## ORDER

For the reasons stated in the Court's accompanying memorandum opinion, it is hereby

**ORDERED** that Defendant's motion for summary judgment [Dkt. No. 11] is granted.

This is a final, appealable order.

**SO ORDERED.**

Date: 6/12/14

CHRISTOPHER R. COOPER
United States District Judge

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FREEDOM WATCH, INC.,

        Plaintiff,

        v.

NATIONAL SECURITY AGENCY,
CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE, and
DEPARTMENT OF STATE,

        Defendants.

Case No. 1:12-cv-01088 (CRC)

## MEMORANDUM OPINION

Freedom Watch, Inc., challenged the responses of four federal agencies to its Freedom of Information Act ("FOIA") requests regarding a 2012 *New York Times* article discussing a U.S. cyber-attack on Iran. After the Court ruled in favor of three of the agencies on the pleadings, and dismissed claims against the State Department with respect to all but one category of requested records, the State Department conducted a rolling search for records responsive to Freedom Watch's lone remaining request. Because the Department's affidavits establish that it conducted an adequate search, and Freedom Watch has not provided any evidence to the contrary, the Court will grant the Department's motion for summary judgment.

    I.      **Background**

The genesis of this dispute is a June 1, 2012 *New York Times* article by David Sanger describing the Bush and Obama Administrations' classified program to undermine Iran's nuclear program by releasing a computer "worm" within that country's main nuclear enrichment plant. Compl. Ex. 1. Sanger reportedly based his account of the initiative—dubbed "Olympic Games"— on interviews with "current and former American, European and Israeli officials involved in the program, as well as a range of outside experts." Id. Freedom Watch believed that classified

information about the program had been leaked by "Obama Administration sources on the President's behalf . . . to further [his] 2012 re-election campaign[,]" notwithstanding the multiple other potential sources for the information contained in the article.  Id.  Expressing alarm that these suspected leaks had jeopardized national security and hastened a confrontation between Iran and Israel, Freedom Watch submitted  requests under the Freedom of Information Act, 5 U.S.C. § 552, to the Department of Defense ("DOD"), the Central Intelligence Agency ("CIA"), the National Security Agency ("NSA"), and the State Department.  The requests sought: (1) information relating to the article, including classified information that was allegedly leaked to Sanger; (2) records relating to information released to Sanger; (3) information on whomever provided information to Sanger; (4) communications with the White House regarding the article; (5) information related to "the decision to 'leak'"; and (6) information on any government investigations into the article.  Id. ¶ 4.

After waiting the required 20 days, see 5 U.S.C. § 552(a)(6)(A), Freedom Watch filed suit to compel the four agencies to search for and produce responsive records.  The NSA and the CIA moved for judgment on the pleadings and the DOD moved for summary judgment, each of which the Court granted, resolving all claims in favor of those agencies.  Order (Dec. 13, 2012).  The Court also granted the State Department's motion for judgment on the pleadings with respect to requests 1 and 3–6, finding the requests to be overly speculative, but denied it as to Freedom Watch's second request, regarding information released to Sanger.  Id.

After the partial dismissal, and while summary judgment briefing was still ongoing, the State Department conducted several searches for records responsive to Freedom Watch's second request.  The Department's searches are detailed in declarations provided by Sheryl L. Walter, Director of the Department's Office of Information Programs and Services ("IPS").  According to Ms. Walter, IPS evaluated Freedom Watch's request "to determine which offices, overseas posts, or

records systems within the Department may be reasonably expected to contain the records requested." Supplemental Walter Decl. ¶ 1. This selection process was based on "the holdings of the Department's records systems, applicable records disposition schedules, and the substantive and functional mandates of numerous Department offices and Foreign Service posts and missions" as well as the "nature, scope, and complexity of the request." Id. ¶ 10. IPS identified three "offices or records systems with a reasonable possibility of possessing responsive documents": the Central Foreign Policy Records, which, as the name suggests, is the central record system at the Department; the Bureau of Public Affairs, which is charged with managing communications between the Department and the media; and the Bureau of Near Eastern Affairs, which "advis[es] the Secretary of State on matters in North Africa and the Middle East." Id. ¶¶ 12–18.

With relevant locations for the search determined, Department employees began by conducting full text searches of the electronic record systems in each department—including individual electronic records of all employees in the Bureau of Public Affairs and 15 employees in the Bureau of Near Eastern Affairs' Iran office—for the terms "David Sanger" and "David E. Sanger." Id. ¶¶ 14, 17, 19. The Near Eastern Affairs Bureau's Iran office also searched physical records that its employees knew to be excluded from the electronic records system and had a "reasonable possibility of containing information responsive to this FOIA request." Id. ¶ 19. These initial searches identified no responsive documents except in the Bureau of Public Affairs, which discovered three records, two of which the Department released in full and one it released in part after redacting material it deemed nonresponsive. Id. ¶¶ 9, 14, 17, 19.

After receiving Freedom Watch's opposition to its summary judgment motion, the Department voluntarily asked the Bureau of Public Affairs to confirm that no other locations should be searched. In response, the Bureau determined that it had neglected to search its front office, which performs executive tasks to support the Bureau. Second Supplemental Walter Decl. ¶ 6.

3

Due to its discovery of additional potentially responsive records, the Department sought and was granted a 60-day extension of time to conduct a supplemental search and reply to Freedom Watch's opposition brief. Order (June 5, 2013). Employees of the Bureau conducted a search of the front office's paper records and searched its electronic records for the term "Sanger," uncovering 62 responsive documents. These documents revealed that Sanger had interviewed five State Department employees. Id. ¶¶ 7–9. The Department then searched the records of those five employees and their respective departments—by manual search of paper records and full-text search of electronic records for the term "Sanger"—discovering 14 additional documents. Id. ¶¶ 10–19. Since the beginning of this suit, the State Department has produced a total of 79 documents responsive to Freedom Watch's FOIA request, releasing 58 in full, 20 in part, and withholding one in full. Id. ¶¶ 3, 48.

In the midst of the Department's voluntary supplemental search, Freedom Watch moved to depose a State Department records custodian concerning the adequacy of the original search, which Freedom Watch suggested was part of a pattern of "outright obstruction of justice" by the Obama Administration. Mot. for Discovery at 1. Judge Wilkins denied the motion, finding no evidence of bad faith on the part of Department, but invited Freedom Watch to renew its request after the Department had an opportunity to fully explain the adequacy of its search. Minute Order (June 18, 2013). Freedom Watch has declined to renew its motion or to challenge the Department's supplemental production.

## II.     Standard of Review

The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must accept the non-movant's evidence as true and draw all reasonable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986). "FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); accord Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment in the FOIA context requires the government to "demonstrate the absence of a genuine dispute regarding the adequacy of its search for or production of responsive records." Judicial Watch, Inc. v. Dep't of the Navy, 971 F. Supp. 2d 1, 3 (D.D.C. 2013) (citing Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs., 849 F. Supp. 2d 13, 21–22 (D.D.C. 2012)).

**III.    Analysis**

A.   Adequacy of the State Department's Search

To meet its FOIA obligations, an agency must show that it "conducted a search reasonably calculated to uncover all relevant documents." Weisberg v. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983). The agency is not required to prove that it discovered every possibly relevant document, id. at 1485, but simply must demonstrate "a good faith effort[.]" Oglesby v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). The Court will judge the adequacy of an agency's search for documents by a standard of reasonableness that "depends, not surprisingly, upon the facts of each case." Weisberg, 705 F.2d at 1485.

The Court may grant summary judgment on the basis of agency affidavits and declarations alone when they are "relatively detailed and non-conclusory." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). The affidavits need not "set forth with meticulous documentation the details of an epic search for the requested records[.]" Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). But they must describe "what records were searched, by whom, and through what processes," Steinberg v. Dep't of Justice, 23 F.3d 548, 551–52 (D.C. Cir. 2008) (citing Weisberg v. Dep't of Justice, 637 F.2d 365, 371 (D.C. Cir. 1980)), and should "set[] forth the search terms and the type of search performed and aver[] that all files likely to contain

responsive materials . . . were searched." Ogelsby, 920 F.2d at 68. There is a presumption of good faith accorded to agency submitted affidavits or declarations, "which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., 926 F.2d at 1200 (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

  The State Department has demonstrated that it conducted an adequate search for records responsive to Freedom Watch's FOIA request. Ms. Walter's declarations indicate the places that were searched and explain why the Department determined that those records systems were likely to contain responsive documents. IPS searched the central record system for the State Department as a whole, the record systems of the bureau that manages communications with the media, and the bureau that oversees policy in Iran, the country to which Sanger's article relates. Supplemental Walter Decl. ¶¶ 12–13, 14, 18. These are perfectly logical locations to search for potentially responsive records. Walter's declarations further explain that the terms "David Sanger" and "Sanger" were used to search relevant electronic records and that physical files were reviewed by knowledgeable staff. Id. ¶¶ 14, 17, 19; Second Supplemental Walter Decl. ¶¶ 7–9. Searching by Sanger's name was a reasonable method of uncovering documents regarding what information employees may have given him; indeed, Freedom Watch does not quarrel with the search methods used. Additionally, when IPS realized it had neglected to search other relevant record systems or when documents suggested that other individuals might have responsive records, the Department responded by conducting further searches and providing Freedom Watch additional responsive records. Second Supplemental Walter Decl. ¶¶ 7–19. Notably, Freedom Watch does not object to the adequacy of the supplemental searches conducted after it filed its opposition.

  Freedom Watch may overcome the presumption of good faith accorded the State Department's declarations by presenting countervailing evidence, see Iturralde v. Comptroller of the Currency, 315 F.3d 311, 314 (D.C. Cir. 2003), but it has not done so. It offers instead

6

speculative, unsupported assertions that do not call into question the adequacy of the State Department's search. It posits, for example, that Sanger must have received the information for the article directly from former Secretary of State Hillary Clinton, and that "someone was undoubtedly present at the interview and was responsible for taking notes, preparing memoranda, and/or preparing some sort of record of the Secretary of State's statements." Pl.'s Opp. to Mot. for Summ. J. at 2, 6–8. These allegations, lacking any evidentiary support, are insufficient to contradict the comprehensive description of the search set forth in the Walter declarations. See SafeCard Servs., 926 F.2d at 1201 ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." (citation omitted)). Moreover, the Court determines adequacy "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315.

Freedom Watch also questions the adequacy of the State Department's search because the lion's share of responsive documents was found only as a result of corrective searches. Pl.'s Opp. to Mot. For Summ. J. at 3–4. But "it does not matter that an agency's *initial* search failed to uncover certain responsive documents so long as subsequent searches captured them." Hodge v. FBI, 703 F.3d 575, 580 (D.C. Cir. 2013) (emphasis in original). Unless Freedom Watch "can identify any additional searches that must be conducted," id., which it has declined to do, the State Department has met its burden by conducting searches that were reasonably calculated to find responsive records, regardless of whether the records were found initially or after subsequent searches.

Finally, Freedom Watch argues that because IPS referred one document to another agency for review and redaction, Walters lacks "the requisite personal knowledge as to" whether the document was responsive or was appropriately redacted. Pl.'s Opp. to Mot. for Summ. J. at 6–7. Walter's supplemental declaration explains that the document in question originated with the

7

National Security Staff ("NSS"), now called the National Security Council, which requested the redaction of nonresponsive sections. Second Supplemental Walter Decl. ¶¶ 3–4. Walter, as IPS's director, had sufficient personal knowledge of the document's content because IPS initially discovered the document before sending it to NSS, which then requested redactions that *IPS* performed. Id. She also adequately justifies withholding parts of the document, explaining that the redacted information discussed issues that were of media interest at the time but were not related to the subject of Freedom Watch's request. Id. The practice of redacting non-responsive materials from documents produced in response to FOIA requests has been approved by courts in this Circuit. See, e.g., Menifee v. Dep't of the Interior, 931 F. Supp. 2d 149, 167 (D.D.C. 2013); Pinson v. Lappin, 806 F. Supp. 2d 230, 237 (D.D.C. 2011); Wilson v. Dep't of Transp., 730 F. Supp. 2d 140, 156 (D.D.C. 2010), aff'd, 10-5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010).[1]

In summary, the State Department has submitted "reasonably detailed" declarations "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched[.]" Oglesby, 920 F.2d at 68. Because Freedom Watch has not offered evidence to counter the Department's declarations, the State Department has satisfied its burden to establish that it conducted an adequate search in response to Freedom Watch's FOIA request.

---

[1] Freedom Watch also argues that it cannot know if the search was adequate without knowing how many subsidiary departments actually exist within the State Department and expresses skepticism that "a large federal agency throughout the world[] only has two databases from which to search." Pl.'s Opp. to Mot. for Summ. J. at 7. As stated above, however, mere speculation that other record systems should exist does not contradict the State Department's affidavits explaining why certain record systems were determined likely to contain responsive records. See SafeCard Servs., 926 F.2d at 1201. The Court also notes that the State Department's website provides a publically available chart of its subsidiary departments. Department Organization Chart: March 2014, U.S. Department of State, http://www.state.gov/r/pa/ei/rls/dos/99494.htm (last visited June 12, 2014).

B. The State Department's Vaughn Index

In addition to challenging the adequacy of the State Department's search, Freedom Watch argues in its opposition that the Department failed to create a Vaughn index for the withheld documents. Pl.'s Opp. to Mot. for Summ. J. at 8–9. The only document withheld when Freedom Watch filed its opposition was the NSS document, which, as explained above, the State Department adequately justified redacting. After conducting supplemental searches, the State Department withheld several other documents in whole or in part, but detailed for each record the type of document, the author of the document, a general description of the contents of the document, and the basis for the exemption being claimed. See Second Supplemental Walter Decl. ¶¶ 20–47. "[A]n agency does not have to provide an index per se, but can satisfy its burden by other means, such as . . . providing a detailed affidavit or declaration." Voinche v. FBI, 412 F. Supp. 2d 60, 65 (D.D.C. 2006) (citing Gallant v. NLRB, 26 F.3d 168, 172 (D.C. Cir. 1994)). The descriptions in Walter's declaration "give the reviewing court a reasonable basis to evaluate the claim of privilege," Gallant, 26 F.3d at 172–73, and thus adequately support the State Department's withholdings.

C. Exemption 5

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 522(b)(5). Exemption 5 encompasses the deliberative process privilege, which protects "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and polices are formulated.'" Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132,150 (1975)). The purpose behind the privilege—and thus Exemption 5—is "to enhance the quality of agency decisions by protecting open and frank discussion among those who

9

make them within the Government." Id. at 9.

Pursuant to Exemption 5, the State Department withheld portions of three documents and all of one document because they contained briefing material for senior department officials with "preliminary thoughts and ideas determined to be important for preparing [the] senior official[s] for an interview with a journalist from a major news media organization." Second Supplemental Walter Decl. ¶¶ 27, 31, 46, 47. Because these documents reflect intra-agency deliberations on communications with the media, they fall within the deliberative process privilege and are covered under Exemption 5. See Judicial Watch, Inc. v. Dep't of Commerce, 337 F. Supp. 2d 146, 174 (D.D.C. 2004) (agency properly withheld "talking points and recommendations for how to answer questions . . . . prepared by [agency] employees for the consideration of [agency] decision-makers"); see also Competitive Enter. Inst. v. EPA, 12-1617, 2014 WL 308093, at *10–11 (D.D.C. Jan. 29, 2014) (Exemption 5 held to protect "media-related withholdings . . . reflect[ing] ongoing decisionmaking about 'how the agency's activities should be described to the general public'").

D. Exemption 6

FOIA Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" broadly include documents containing "purely personal information." See, e.g., Gov't Accountability Project v. Dep't of State, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) (citing Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982)).

The State Department withheld information in 17 documents provided to Freedom Watch pursuant to Exemption 6 because the redacted information consisted of personal email addresses, phone numbers, and details of individuals' personal lives. Second Supplemental Walter Decl. ¶¶ 28–30, 32–45. Such "purely personal information" clearly falls within Exemption 6.

10

## IV. Conclusion

For the foregoing reasons, the Court will grant the State Department's motion for Summary Judgment. The Court will issue an order in accordance with this Memorandum Opinion.

Date:   June 12, 2014

                                              CHRISTOPHER R. COOPER
                                              United States District Judge